IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GERALD JONES, B13486,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 23-cv-2804-DWD |
| ) | |
| **ANTHONY WILLS, ET AL.,** ) | |
| ) | |
| **Defendants.** ) | |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Gerald Jones, brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Menard Correctional Center (Menard). In short, Plaintiff alleges he was assaulted upon arrival to Menard in late July 2023, and he almost immediately engaged in acts of self-harm but was unable to secure needed medical or mental health treatment. The Defendants moved for summary judgment on the issue of exhaustion of administrative remedies (Docs. 107, 111), Plaintiff responded (Doc. 121), and one group of defendants replied (Doc. 123). Upon review of the written pleadings, the Court determined that there was a genuine dispute of material fact about the availability of grievance forms prior to the filing of the operative complaints, so the matter was set for a *Pavey* hearing. Prior to the hearing, Plaintiff proposed five witnesses, Defendants responded, and the Court narrowed the witness request to just one witness. After a hearing on April 22, 2025, the Court now finds that Plaintiff failed to exhaust his administrative remedies, so this lawsuit must be dismissed without prejudice.

## BACKGROUND

This matter began as two separate lawsuits—one about the alleged assault and self-harm behavior, as well as Plaintiff's immediate conditions of confinement (23-cv-2804), and one about the alleged mental health treatment issues (23-cv-2889). In both cases, Plaintiff received authorization to proceed without prepayment of the filing fee, despite his status as an inmate who has accrued three strikes under 28 U.S.C. § 1915(g), because the Court found he credibly alleged imminent danger at the initiation of the suits. The Court ultimately consolidated the two cases (Doc. 55), and after consolidation Plaintiff managed to identify eight "Jane Doe" defendants who he alleges denied him adequate mental health treatment. The operative claims are:

**Claim 1:** **Eighth Amendment excessive force claim against Defendant Ramsey for allegedly beating Plaintiff upon his arrival to Menard on July 29, 2023;**

**Claim 2:** **Eighth Amendment excessive force or deliberate indifference claim against Defendant Kulich for observing Plaintiff bleeding from self-harm and choosing to first mace him instead of rendering immediate assistance;**

**Claim 3:** **Eighth Amendment deliberate indifference against Defendant Quick for refusing medical or mental health assistance on August 3, 2023;**

**Claim 4:** **Eighth Amendment cruel and unusual punishment or conditions of confinement claim against Defendant Maldonado for shutting Plaintiff's water off frequently to cause him distress;**

**Claim 5:** **Eighth Amendment cruel and unusual punishment claim against Defendants Garcia and Bent for verbally threatening Plaintiff;**

**Claim 6:** **Eighth Amendment deliberate indifference claim against Warden Wills for ignoring Plaintiff's correspondence about his situation, and failing to render aid;**

> **Claim 8:** Eighth Amendment claim against Defendants Overmann, Wilkes, Buettner, Phillips, Carich, Winger, Salger, and Franklin for their deliberate indifference to Jones's serious mental illness and related mental health needs from July 29, 2023, through August 21, 2023.
>
> **Claim 9:** Illinois state law claim against Defendants Overmann, Wilkes, Buettner, Phillips, Carich, Winger, Salger, and Franklin for their intentional infliction of emotional distress on Jones from July 29, 2023, through August 21, 2023.

(Doc. 76). Other claims and parties were dismissed, and Plaintiff's attempt to later amend the claims and parties was rejected for a variety of reasons. (Doc. 112).

The mental health employees subject to claims 8 and 9 filed one motion for summary judgment (Docs. 107, 108), and the Menard prison staff filed a second motion (Doc. 111). Plaintiff filed a joint response to both motions. (Doc. 121). The mental health employees replied. (Doc. 123). The parties agree that there are no officially documented grievances that Plaintiff filed prior to initiating this lawsuit.

## FINDINGS OF FACT

The parties agree that Plaintiff arrived at Menard on July 30, 2023. Plaintiff's complaint in case 23-cv-2804 was filed on August 15, 2023, and his complaint in 23-cv-2889 was filed on August 21, 2023.

As the Court indicated in the earlier written ruling on summary judgment, Plaintiff contended in his sworn response to summary judgment that he attempted to transmit emergency grievances to Warden Wills and the governor of Illinois on August 8, 2023, and August 11, 2023, respectively. (Doc. 121 at 4, ¶ 6). He also claimed that prior to filing grievances at Menard on September 6, 2023, he was not afforded access to any

grievance forms, and he was only able to file the September grievances by receiving forms from a fellow inmate. (Doc. 121 at 4, ¶ 6).

The Defendants identified grievances filed in September of 2023 as the first grievances Plaintiff filed at Menard after arriving in late-July. (Doc. 108-2 at 78-81). Defendants also included Plaintiff's cumulative counseling summary, which does not indicate any grievances filed around August 8, 2023. (Doc. 111-2 at 1). However, a note from September 6, 2023, indicates that when seen on tour Plaintiff asked the counselor about a grievance form and the counselor reported that he told Plaintiff he "hadn't heard about any grievance he has sent." (Doc. 111-2 at 1). The counseling log from September 19, 2023, indicated receipt of two grievances that Plaintiff marked as emergencies, but that the Warden deemed as non-emergencies. (*Id.*).

The parties desired testimony from the same two individuals—Plaintiff and counselor Sara Quick. On direct examination by the Defendants, Plaintiff testified that from his July 30, 2023, arrival at Menard until about August 2, 2023, he was on suicide watch. Immediately upon release from suicide watch to restrictive housing he began to ask for grievance forms. He asked gallery officers, and he also asked Quick when he saw her during rounds in his cellhouse. He claimed that she sometimes would skip his cell, she would ignore his request for grievance forms, or she would redirect his queries solely to medical staff. She would also allow escort officers to answer his queries instead of directly answering his questions herself. Plaintiff estimated that he asked for grievance forms every 2-3 days.

Plaintiff testified that he was able to get a pen, paper, and eventually grievance forms from other inmates either by passing materials via inmate workers who freely roamed the gallery, or by throwing strings from cell to cell. He testified that after this lawsuit was filed, he was able to get a few grievance forms from a fellow inmate that he filed in September of 2023. He also agreed that he had submitted a December 2023 grievance, and stated he was able to obtain the form for that grievance from a prison staff member. Plaintiff testified that, to date, some gallery officers will supply him grievance forms, but others refuse.

Specific to this case, he testified that given the lack of grievance forms, he attempted to send letters to Warden Wills on August 9, 2023, and the Governor on August 11, 2023. He stated he had no handwritten copies. He sent the alleged grievance to the Warden via institutional mail, and he testified that he paid postage to send the letter to the Governor. He claims that he never got a receipt for the postage. Plaintiff testified that he asked a counselor about his receipt on September 6, 2023, but that the counselor did not fully reflect that interaction in the counseling notes. (Doc. 111-2 at 1). In addition to sending these two documents, Plaintiff testified that on August 8, 2023, he filed a document in the *Rasho* class action lawsuit pertaining to his issues.

Plaintiff also testified that he believed prison staff were supposed to respond to an emergency grievance within 3 days of filing, although he could not point to a specific source for this proposition.

Defendants then called Counselor Sara Quick. In August of 2023, Quick was a correctional counselor II, whose job was to make rounds in Plaintiff's cellhouse. She

testified that inmates could get grievance forms by asking a counselor, sergeant, or 5-day officer. She stated that if she was asked for a grievance form she would either retrieve one within the cellhouse and have an inmate worker walk it over to the inmate's cell while she watched, or she would send a grievance form via institutional mail. If an inmate did not have a grievance form and instead submitted something to the grievance office on plain paper, then the grievance office would return the document with a grievance form attached so that the inmate could file the proper form.

By reference to the cumulative counseling summary, Quick testified that she saw Plaintiff during her cellhouse rounds on August 3, 2023, August 11, 2023, and August 17, 2023. On each date, if Plaintiff had specific needs, she would note those in the counseling summary. On August 3, 2023, Plaintiff requested bedding and medical attention, so she relayed those needs to the sergeant and noted on the counseling summary what transpired. She indicated that if Plaintiff had asked her about grievances, it would have been noted because it is her custom and practice to note inmate requests that are discussed on tour. She also testified that if an inmate was not in his cell during her tour, she would make a point to see that individual a different day, and she would not simply skip an individual during her tour.

Quick was asked if she knew of any 3-day timeframe for processing grievances, but she said she did not know of any such requirement. She testified that for emergency grievances, if the warden was not available, an assistant warden could conduct that initial review. Menard receives a high-volume of grievances, and she indicated grievances and emergency grievances are always handled in the order they are received.

Plaintiff examined Quick both on cross-examination as to her testimony already given, and on a broader scale because he expressed the desire before the hearing to call her as a primary witness. He asked Quick if she was coached on her testimony or had an incentive for the case to be dismissed. She indicated that although she was a defendant in the case, her testimony was truthful and was not coached. Plaintiff attempted to question Quick repeatedly about the contents of her alleged responses or replies to the summary judgment briefing in this case, but she stated she did not have personal knowledge of the specific contents of those filings.

Quick testified that she did not know if there was a policy that required counselors to distribute grievance forms, but it was her personal practice to ensure an inmate got a form if he asked for a grievance form. She also stated that if Plaintiff voiced needs to her, it was her practice to document what he voiced in her counseling notes. In her time as a counselor, she was aware of only a handful of times where inmates claimed that they could not get grievance forms from staff, but in those instances, she either immediately retrieved a form or would send one via institutional mail. When asked why she left Plaintiff in need of medical care from August 3, 2023, until a later encounter they had on August 29, 2023, she indicated she did not believe he needed medical aid for that entire time-period. Specifically, she pointed to the face-to-face encounters she had with Plaintiff on August 11 and 17, 2023, where he did not voice any concerns during her tour of the cellhouse. (Doc. 111-2 at 1). She took this to mean that whatever medical referral she made on August 3, 2023, was sufficient until he again requested care on August 29, 2023.

During his own direct examination, Plaintiff claimed that Quick refused him grievance forms and left him bleeding in his cell in distress because he was transferred to Menard for a staff assault. He claims Quick ignored his pleas for help to appease officers that escorted her around the cell house. He further testified that he was aware of the grievance process and had no reason not to follow it. He pointed to 42 U.S.C. § 10807 for the proposition that as an inmate with imminent mental health needs, he was not required to exhaust administrative remedies. He also repeated his argument that Quick's testimony at the hearing was inconsistent with the summary judgment briefs. He specifically claimed that paragraphs 1, 12, and 15 of the statement of material fact did not get responses or were inconsistent with her testimony.

## CONCLUSIONS OF LAW

A. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving part." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008). "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and

appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Id.* at 1024. However, "if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting," then the grievance procedure becomes unavailable. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (finding that an inmate who placed a timely ARB appeal in his chuckhole for mailing, but whose grievance was apparently lost, did all that he could to follow exhaustion procedures).

"When prison officials fail to provide inmates with the forms necessary to file an administrative grievance, then administrative remedies are not 'available.'" *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). In *Hill v. Snyder*, the Seventh Circuit held that "exhaustion is not required when the prison officials responsible for providing grievance forms refuse to give a prisoner the forms necessary to file an administrative grievance." 817 F.3d 1037, 1041 (7th Cir. 2016) (*citing Dale v. Lappin*, 376 F.3d 652, 655–56 (7th Cir. 2004)). Evidence of the appropriate official's refusal to give a prisoner an available form "is sufficient to permit a finding" that the administrative remedies were not available. *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022). If appropriate officials refuse to provide a grievance form, Plaintiff is not required to go on a scavenger hunt to find another way to file his grievance. *See e.g.*, *Hill v. Snyder*, 817 F.3d at 1041.

As an inmate in the Illinois Department of Corrections (IDOC), Plaintiff must follow the grievance process outlined in the Illinois Administrative Code. 20 ILL. ADMIN.

CODE § 504.800, et seq. (2017). Under IDOC's procedure, an inmate initiates a grievance with his counselor, and he may then submit his grievance to a grievance officer at his facility, and to the CAO at his facility. An inmate may also submit a grievance as an emergency to the CAO if there is a substantial risk of imminent personal injury or other serious irreparable harm. 20 ILL. ADMIN CODE § 504.840(a). The CAO may either deem the grievance an emergency, or the CAO may deem it a non-emergency and return it to the offender for processing via the normal channels. *Id.* The Illinois Administrative Code requires that grievances be filed on the proper form. 20 Ill. Admin. Code § 504.810. An informal letter does not take the place of properly following the grievance process. *Scott v. Baldwin*, 2020 WL 5500532 at * 5 (S.D. Ill. Sept. 11, 2020).

   B. Analysis

   As the Court previously noted, this case comes down to a credibility determination. The Defendants established and Plaintiff freely agreed that he was aware of the grievance process and that he knew how to use the process. The sole question to be resolved is if Plaintiff had access to grievance forms between July 30, 2023, and August 21, 2023. He filed his lawsuit containing claims 1-6 on August 15, 2023, and filed his lawsuit against the mental health defendants on August 21, 2023. Thus, the defendants must demonstrate that prior to this time he was able to access grievance forms.

   Counselor Quick credibly testified that she did rounds in Plaintiff's cellhouse during the relevant time in August of 2023. During rounds, if Plaintiff made any requests to her, it was her practice to chart those requests in the cumulative counseling notes. She acted consistent with this practice on August 3, 2023, when she charted that he asked for

bedding and medical assistance. She relayed those needs to the sergeant. She has no notation from visits on August 3, 11, or 17th, 2023, that Plaintiff ever asked her for a grievance form. If he asked her for a grievance form she would have immediately delivered one or watched an inmate worker deliver it, or she would have sent one via institutional mail. In either instance, she would have noted the request and action in the counseling notes. If an inmate did not have a proper grievance form, she also testified that if he submitted a grievance on plain paper to the grievance process, he would have received a response with a proper grievance form appended so that he could complete a grievance submission.

      Plaintiff attempted to attack Quick's credibility, claiming that she had a motive to secure the dismissal of this case though any means. Quick's counsel filed a summary judgment brief that did not include any statements of material fact directly about Quick's actions or knowledge. In response to summary judgment, Plaintiff asserted in his own statement of material facts that that Quick refused to give him grievance forms so that he could file an emergency grievance between August 4, 2023, and August 21, 2023, making the grievance process unavailable to him. (Doc. 121, p. 5 ¶ 1). He further asserted it can take months or longer to get grievance forms from other inmates because gallery officers sometimes refuse the forms for months at a time. (Doc. 121, p. 7 ¶ 11). He additionally claimed the Defendants conspired to refuse to give him grievance forms prior to the filing of this lawsuit. (Doc. 121, p. 7 ¶ 12). In support of the statement about the conspiracy, he cited Exhibit B—a September 19, 2023, written note from Counselor Olson that indicated he did not personally distribute grievance forms. (Doc. 121 at p. 20).

At the hearing, Plaintiff attempted to fault Quick for either giving testimony inconsistent with her summary judgment briefs, and/or for lying about her actions in August of 2023. There are no factual statements about Quick in her primary summary judgment brief (Doc. 111), and her counsel did not file a summary judgment reply, so she cannot be faulted for contradicting either of those sources. It seems that Plaintiff was attempting to impeach her for giving statements inconsistent with his *own* statement of material facts, but this is not a viable strategy because there is no concrete evidentiary proof to support his assertions in his statement of material facts that she denied him grievance forms. The contradiction between his statement of facts and the Defendants' statements was the whole reason for the hearing, and ultimately the dispute is an issue of credibility for the Court to resolve, but it is not a basis for impeachment.

Plaintiff maintained that Quick refused him grievance forms, and he suggested she did so out of animus for the alleged staff assault that led to him being transferred to Menard. Although this theory is not wholly implausible, it is simply not supported by the evidence. Quick testified she would have documented requests for grievance forms and would have secured forms for Plaintiff. She also testified that if he submitted a grievance on blank paper to the grievance process, it would have been documented and returned with a proper form for re-submission. Plaintiff testified at the hearing that he had access to paper and writing utensils on or before August 8, 2023. Thus, he could have submitted a grievance to the emergency grievance process the correct way on plain paper. Instead, he claims he elected to send letters to the Warden and Governor. A letter sent via the institutional mail, or the U.S. Mail, is not an adequate substitute for a formal

submission to the grievance process. This was not a viable alternative and did not satisfy the grievance process. *See, Scott v. Baldwin*, 2020 WL 5500532 at * 5 (S.D. Ill. Sept. 11, 2020) (a letter does not take the place of following the institution's grievance process); *see also, Twitty v. McCoskey*, 226 Fed. App'x 594, 596 (7th Cir. 2007) (inmate's verbal and written complaints that did not comply with the jail's formal grievance process and were not a substitute for proper exhaustion); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) (an inmate must file a grievance in the time, place, and manner required by the prison's administrative rules.

He testified at the hearing that he also filed a document in the class action *Rasho* lawsuit on August 8, 2023. Reviewing the publicly available docket sheet, the Court was able to locate this filing in the *Rasho* case. *Rasho v. Eleya*, Case No. 07-cv-1298 (C.D. Ill. Aug. 8, 2023, docket entry 3725). In the *Rasho* case, Plaintiff filed a motion seeking injunctive relief and set forth the same essential facts as he did in this case. *Id.* He claimed that immediately upon arrival at Menard, he was seriously beaten. He then resorted to self-harm cutting his arms. He claimed that as of August 4, 2023, he could not get needed care. He made no mention of any attempt to initiate the grievance process, though he stated he was able to fish for writing materials under his cell door from fellow inmates. He dated the motion August 4, 2023. Plaintiff's filing in the *Rasho* case does nothing to bolster his position about the exhaustion of administrative remedies. If anything, the fact that he had sufficient writing materials to file that motion and access to the E-filing process to transmit it to the Court is evidence that staff was not preventing him from seeking redress.

Plaintiff also argued at the hearing that per 42 U.S.C. § 10807, he was not required to exhaust administrative remedies. He is right that § 10807 discusses the exhaustion of administrative remedies as it pertains to imminent serious harm to an individual with mental illness, but this section does not apply to inmates. Section 10807 indicates in full:

> (a) Prior to instituting any legal action in a Federal or State court on behalf of an individual with mental illness, an eligible system, or a State agency or nonprofit organization which entered into a contract with an eligible system under section 10804(a) of this title, shall exhaust in a timely manner all administrative remedies where appropriate. If, in pursuing administrative remedies, the system, agency, or organization determines that any matter with respect to such individual will not be resolved within a reasonable time, the system, agency, or organization may pursue alternative remedies, including the initiation of a legal action.
> (b) Subsection (a) does not apply to any legal action instituted to prevent or eliminate imminent serious harm to an individual with mental illness.

By the plain text, this section applies to actions filed *on behalf* of individuals that are mentally ill, not to those filed directly by individuals who are mentally ill. Furthermore, § 10807 falls within the scope of laws designed to protect those with serious mental illness who cannot advocate for themselves and cannot prevent abuse or neglect. *See e.g.*, 42 U.S.C. § 10801, et seq ("Protection and Advocacy for Individuals with Mental Illness Act of 1986, the PAIMI Act). The PAIMI Act creates funding for states to establish systems to protect seriously mentally ill individuals. *See e.g. Indiana Protection and Advocacy Services, Indiana Family and Social Services Admin.*, 603 F.3d 365, 367-68 (7th Cir. 2010) (describing the PAIMI Act). Plaintiff does not fall within the scope of the PAIMI Act. He may be an individual with serious mental illness, but this is not a lawsuit about a state created

advocacy system. Thus, § 10807 does not excuse the grievance process as a precondition to filing a lawsuit for him.

To the extent that Plaintiff pointed to a September 19, 2023, written exchange with another correctional counselor about his access to grievance forms, this evidence is not persuasive. Quick testified that it was her personal custom to ensure inmates got grievance forms if they asked her for forms. The conduct of a different counselor has no bearing on her own actions. Additionally, by the time Plaintiff made this request to the other counselor he had already filed this lawsuit, and he had already secured and filed grievance forms from other inmates. Whatever may have happened with respect to his pursuit of grievance forms after August 21, 2023, is irrelevant.

Plaintiff also attempted to argue by reference to old grievances responses that he would not have been able to get a merits-based response to a grievance from a counselor, grievance officer, warden, or the Administrative Review Board. He tried to question Quick on this, pointing her to a previous grievance response that he got from the ARB deferring to treatment decisions of medical/mental health professionals. This line of argumentation is irrelevant to the exhaustion issue in this case because Plaintiff did not face unavailability in this case based on the lack of his ability to get a merits-based response to a grievance. If anything, the sole unavailability he experienced was the alleged inability to secure physical grievance forms.

Returning at last to Plaintiff's ability to secure grievance forms prior to August 21, 2023, the Court finds that the Defendants credibly established that Plaintiff knew the grievance process, and that he could have accessed forms from Quick or other gallery

staff. Even if he did not have forms, he could have submitted a handwritten grievance on blank paper for emergency processing, and he would have been provided with a proper grievance form. He has no evidence that he did this other than his own word that he wrote letters to the Warden and Governor. Letters are not the same as a submission to the grievance process. The Court finds that Quick's account of things is more credible than Plaintiff's, and it establishes that the grievance process was available. Plaintiff did not credibly rebut this showing via his sworn pleadings or his live testimony. Therefore, the Court must grant summary judgment for Plaintiff's failure to exhaust his administrative remedies prior to filing this lawsuit.

## MISCELLANEOUS MOTIONS

In a Motion filed December 23, 2024, Plaintiff alleges that the Defendants have provided false and misleading records to the Court concerning his ongoing access to mental health care. (Doc. 126). Specifically, he is challenging the veracity of status reports that Defendants have been filing at the Court's request to keep tabs on his mental health care and medical care after earlier proceedings in this case on motions for emergency injunctive relief. He challenges the substance of master treatment plans that mental health professionals prepared and signed, claiming that they falsified his refusal or inability to sign the documents himself. He claims substantively that the treatment plans were 'copycat' duplications of previous plans with ineffective treatment modalities, and that they were falsified to be submitted solely for this litigation.

The mental health defendants opposed his motion, arguing that he did not follow the proper steps under Federal Rule of Civil Procedure 11 to seek sanctions, and that his

assertions are substantively unsupported. (Doc. 138). They supported their contention that the mental health records were accurate by submitting declarations from the mental health providers who prepared the reports attesting to their veracity. Plaintiff replied, claiming that he had not received the response materials, and further contesting there is a conspiracy to tender false evidence. He also argued in greater detail about alleged problems with the substance of the records.

As far as the Court can tell, the mental health records contain only one potential obvious error. In a treatment plan prepared by Ms. Nicholson on September 26, 2024, she indicated that Plaintiff was taking Lexapro and was to continue as prescribed. It was the Court's understanding when making earlier rulings on the motions for injunctive relief in this case that Plaintiff was uninterested in mental health medications. Many of the subsequent treatment records that have been submitted to the Court are consistent with the position that Plaintiff repeatedly refuses mental health medications. As such, it seems Ms. Nicholson's report contained either an accidental or intentional misstatement about a potential prescription. Ultimately, this small detail does not matter in the grand scheme of this litigation. The Court remained satisfied as this case progressed beyond the motions for preliminary injunctive relief that Plaintiff was receiving adequate services for his medical and mental health needs at Menard. Although Plaintiff certainly may desire or need more comprehensive services, that was beyond the bounds of emergency injunctive relief in this case because this case was concerned solely with the events from late July to early August of 2023 that presented an imminent danger at the time the case was filed. Thus, the Court finds no basis to grant any form of sanctions.

Plaintiff's Motion for Adequate Relief (Doc. 145) concerns his alleged efforts to file proof of service for a document in this case. There does not appear to have ever been a dispute that Plaintiff failed to serve a document in this case, but even if there was such a dispute, it is now irrelevant with the dismissal of this case.

### DISPOSITION

**IT IS HEREBY ORDERED THAT** all claims in this case against all Defendants are now **dismissed without prejudice** for Plaintiff's failure to exhaust his administrative remedies prior to filing this lawsuit. The Clerk of Court shall enter judgment and shall close this case.

Plaintiff's Motions (Docs. 126, 145) are **DENIED**.

**IT IS SO ORDERED.**

Dated: April 24, 2025

/s *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge